1    CHRISTOPHER P. WALKER – State Bar No. 174533
LAW OFFICE OF CHRISTOPHER P. WALKER, P.C.

2    505 S. Villa Real Drive, Suite 103
Anaheim Hills, CA 92807

3    Telephone:   (714) 639-1990
Facsimile:   (714) 637-1636

4

Attorneys for Plaintiff

5    .

6

7

8            **UNITED STATES BANKRUPTCY COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| In re: | CASE NO 6:14-bk-19644-SC |
| BANNING AT 8TH STREET, LLC, | ADVERSARY NO. |
| Debtors. | **COMPLAINT FOR DISCLARATORY JUDGMENT AS TO  EACH MEMBERS OWNERSHIP OF THE EQUITY IN THE DEBTOR AND THE RIGHT TO A DISTRIBUTION OF THE NET PROCEEDS FROM THE BANKRUPTCY ESTATE** |
| RAMSEY IRREVOCABLE TRUST NO 1; RAMSEY IRREVOCABLE TRUST NO. II; AND GARY KANTER | |
| Plaintiff, | |
| vs. | |
| RONEN ARMONY; ORI HARPEZ; DORAN SHOAM AND TODD A FREALY, CHAPTER 7 TRUSTEE | |
| Defendants | |

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO  EACH MEMBERS OWNERSHIP OF THE EQUITY IN THE DEBTOR AND THE RIGHT TO A DISTRIBUTION OF THE NET PROCEEDS FROM THE BANKRUPTCY ESTATE**

RAMSEY IRREVOCABLE TRUST NO 1; RAMSEY IRREVOCABLE TRUST NO. II; AND GARY KANTER ("Plaintiff"), for the complaint against RONEN ARMONY; ORI HARPEZ; DORAN SHOAM AND TODD A FREALY, CHAPTER 7 TRUSTEE, alleges as follows:

1.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I), and 1334, 11 U.S.C. § 523 and Rule 7001 of the Federal Rule of Bankruptcy Procedure. This adversary proceeding arises under and in the bankruptcy case entitled <u>In Re BANNING AT 8TH STREET</u>, Case No. 8:14-bk-19644-SC in the United States Bankruptcy Code for the Central District of California.

2.     This adversary proceeding is a core proceeding as defined and set forth in 28 U.S.C. § 157(b)(2)(I) and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

3.     Venue properly lies in this judicial district in that the civil proceeding arises under Title 11 of the United States Code as provided in 28 U.S.C. § 1409.

4.     This is an adversary proceeding in which the Plaintiffs are requesting a declaratory judgment as to their claim of membership interest and their right to distribution of the surplus estate funds. .

## STATEMENT OF STANDING

5.     Plaintiff, as members of the Debtor, have standing to bring this action.

## PARTIES TO THE PROCEEDING

6.     Plaintiffs RAMSEY IRREVOCABLE TRUST NO 1; RAMSEY IRREVOCABLE TRUST NO. II are trusts whose trustee is Robert Kanter. Robert Kanter is a resident of the County of Orange, State of California. Both of these trusts own a twenty-five percent interest in the Debtor. Plaintiff GARY KANTER ("Kanter") is an individual who is the owner of one percent of the membership interest.

7.     Defendant RONEN ARMONY ("Armony") is an individual who at all times herein mentioned did business in the County of Orange, California. Defendant Armony is the owner of 33.5% of the membership interest of the Debtor.

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO EACH MEMBERS OWNERSHIP OF THE EQUITY IN THE DEBTORAND THE RIGHT TO A DISTRIBUTION OF THE NET PROCEEDS FROM THE BANKRUPTCY ESTATE**

8.      Defendant Ori Harpez ("Harpez") is an individual who at all times herein mentioned did business in the County of Orange, California. Defendant Harpez is the owner of 10% of the membership interest of the Debtor.

9.      Defendant Doran Shoam ("Shoam") is an individual who at all times herein mentioned did business in the County of Orange, California. Defendant Shoam is the owner of 5.5% of the membership interest of the Debtor.

10.      Defendant TODD A FREALY, CHAPTER 7 TRUSTEE ("Trustee") is a nominal defendant herein for the sole purpose of putting him on notice of any declaratory relief action ruling regarding the distribution of surplus assets of the estate which are to be distributed by the Trustee. The Trustee, as herein after discussed, has also entered into a stipulation with Defendant Armony regarding the distribution of estate funds to the members of the debtor. The Trustee is also named because he is a party to that stipulation.

11.      Defendant filed a petition under Chapter 11, Title 11 of the United States Bankruptcy Code on or about July 29, 2014 (the "Petition Date").

## GENERAL ALLEGATIONS

12.      The Debtor's principal asset at the time of the petition was a single piece of real property commonly known as 806 and 860 Ramsey Street, Banning, CA 92220 (the "Property").

13.      The Property was sold by the bankruptcy trustee on or about February 11, 2015. As a result of the sale, Plaintiff is informed, believes and based thereon alleges that the bankruptcy estate will have a surplus for distribution to the members of Debtor. Plaintiff is further informed, believes and based thereon alleges that the surplus will be approximately $2,000,000..

14.      On June 4, 2009, the Debtor's members executed an Amendment to the Operating Agreement for Banning at 8th Street, LLC which is the current operating agreement for the Debtor. The Amended Operating Agreement provided that ownership was as follows:

-3-

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO EACH MEMBERS OWNERSHIP OF THE EQUITY IN THE DEBTORAND THE RIGHT TO A DISTRIBUTION OF THE NET PROCEEDS FROM THE BANKRUPTCY ESTATE**

a.  Gary Kanter (26%)

b.  Ben Kanter (deceased) (25%)

c.  Ronen Armony (33.5%)

d.  Ori Harpez (10%)

e.  Doran Shoam (5.5%)

15.    Thereafter, Gary Kanter assigned all but one percent of his membership interest and Ben Kanter assigned all of his interest to two trusts.  Gary Kanter remained as the Managing member Consequently the current membership interest is as follows:

a.  Gary Kanter (1%)

b.  Ramsey Irrevocable Trust No. I (25%)

c.  Ramsey Irrevocable Trust No. II (25%)

d.  Ronen Armony (33.5%)

e.  Ori Harpez (10%)

f.  Doran Shoam (5.5%)

16.    Plaintiff is informed, believes and based thereon alleges that Armony, Harpez and Shoam wanted to purchase the entire ownership interest in the Debtor, were not able to acquire the financing, could not finance the Property , but were unable to pay the entire amount.  As a consequence, Plaintiff's herein retained ownership of the majority of the Debtor.  Gary Kanter remained the only managing member of the Debtor.

17.    After the development of the Property, Kanter and Armony became involved in several disputes unrelated to the Debtor or the Property.  In particular the disputes concerned certain real properties in Victorville California.  In December 2010, Kanter and Armony mediated their disputes.  The mediation resulted in a Mediation Agreement & Settlement dated January 4, 2011 ("Mediation Agreement").  The "gravamen" of the Mediation Agreement (as described by Armony in a State Court Complaint unrelated to the Debtor) was to resolve the issues regarding the Victorville Properties.  However, the Mediation Agreement also included "tertiary" (as described by

-4-

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO EACH MEMBERS OWNERSHIP OF THE EQUITY IN THE DEBTORAND THE RIGHT TO A DISTRIBUTION OF THE NET PROCEEDS FROM THE BANKRUPTCY ESTATE**

1  Armony) promises between the parties as to other projects in various stages of

2  development.  One of these promises involved the ownership of the Debtor and who

3  retains ownership interest.  Attached hereto as Exhibit 1 is a true and correct copy of the

4  Mediation Agreement which is incorporated herein by this reference.

5      18.    The Mediation Agreement provides that Armony would sign an "over-the-

6  top guarantee" to protect Kanter from Liability on his personal guarantee of the Loans on

7  the Property.  See Mediation Agreement, paragraph 8(a).  In exchange, Kanter promised

8  that he would transfer an additional 25% interest in the Debtor to Armony.  This would

9  give Armony 58.5% interest if Armony signed the "over-the-top guarantee and 33.5% if

10  he did not.

11      19.    If Armony contractually took over as the guarantor on the note and

12  removed Kanter as to any liability on the note, he would have gotten the additional 25%

13  and if he does not agree to be liable on the note as the guarantor or he does not remove

14  Kanter from liability on the note, Kanter and the related entities retain the extra 25%

15  interest.

16      20.    The Mediation Agreement did not alter Kanter's duties as Managing

17  member.

18      21.    Armony never executed an "over-the-top guarantee" or any guarantee and

19  never became personally liable on the note.  Kanter and his father Ben Kanter (now

20  deceased) always remained liable on the note and still remain personally liable in this

21  bankruptcy case.

22      22.    Despite the Mediation Agreement, it is Plaintiff's understanding that

23  Armony alleges that Armony, Harpez and Shoam should together own 100% of the

24  Debtor with Armony owning 84.5% of the membership interest of the Debtor.  Plaintiffs

25  dispute this assertion and assert that Armony owns only 33.5% of the membership

26  interest of the Debtor with Harpez owning 10% and Shoam owning 5.5%.  It is Plaintiff's

27

28

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO EACH MEMBERS OWNERSHIP OF
THE EQUITY IN THE DEBTORAND THE RIGHT TO A DISTRIBUTION OF THE NET
PROCEEDS FROM THE BANKRUPTCY ESTATE**

1  position that Plaintiffs collectively own 51% and are entitled to 51% of the distribution of

2  the surplus bankruptcy estate.

3          23.     On or about August 27, 2014, Armony and the Trustee entered into a

4  stipulation resolving certain contested matters between them. As part of the stipulation,

5  Armony and the Trustee agreed as follows:

6          "The Trustee shall not make any distributions of proceeds from the Debtor's

7          Estate to the Debtor's members, including but not limited to any distributions of

8          proceeds from the sale of the Property, until the State Court resolves Armony's

9          claim in the State Court Action that his is the rightful and sole owner of the

10         Debtor."

11         24.     None of the other members of the Debtor, including Harpez, Shoam,

12  Ramsey Irrevocable Trust I, Ramsey Irrevocable Trust II or Kanter were parties to the

13  stipulation. A determination of who is entitled to distribution of estate funds is a core

14  proceeding which Plaintiff's assert should be determined by the Bankruptcy Court. It

15  would also allow for a more efficient administration of the estate as the State Court

16  Action (Superior Court of the County of San Bernardino, Case No. CIV-VS 110628)

17  which is referred to is not currently set for trial and it does not appear that it will be set

18  for trial in the near future. Moreover, the issues involving Debtor are "tertiary" (as

19  described by Armony).

20                       **FIRST CLAIM FOR RELIEF**

21                **(For Declaratory Relief Against All Parties)**

22         25.     The Plaintiff incorporates herein paragraphs 1 through 24, inclusive, of

23  this Complaint, as if set forth in full.

24         26.     An actual controversy has arisen by and between Plaintiffs and Armony,

25  Harpez and Shoam and a real dispute now exists between them concerning their

26  respective rights and ownership interest of the Debtor. Armony, Harpez and Shoam

27  allege that they collectively own 100% membership interest in the Debtor – Armony

28

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO EACH MEMBERS OWNERSHIP OF
THE EQUITY IN THE DEBTORAND THE RIGHT TO A DISTRIBUTION OF THE NET
PROCEEDS FROM THE BANKRUPTCY ESTATE**

(84.5%), Harpez (10%) and Shoam (5.5%) with Plaintiffs owning nothing.  Plaintiffs

allege that they collectively actually own 51% of the Membership Interest in the Debtor –

Kanter (1%), Ramsey Irrevocable Trust I (25%), Ramsey Irrevocable Trust II (25%) and

Defendant collectively own 49% -- Armony (33.5%), Harpez (10%) and Shoam (5.5%).

27.    As a result an actual controversy exists as to who owns the membership

interest of the Debtor and who is entitled to a distribution of any surplus estate funds.

28.    A declaration of rights is necessary and appropriate at this time in order

that the Plaintiffs may ascertain their rights and duties and the Trustee may know who he

is to distribute funds to as members of the Debtor.  No adequate and expeditious remedy

other than a declaration of rights from this Court exists by which the rights of the parties

may be determined.

WHEREFORE, Plaintiff prays that the Court enter a judgment against Defendant as

follows:

(1)    For a judgment declaring the Membership Interest of each of the parties and that

the membership interest in the Debtor are as follows: Kanter (1%), Ramsey Irrevocable

Trust I (25%), Ramsey Irrevocable Trust II (25%) and Defendant collectively own 49% --

Armony (33.5%), Harpez (10%) and Shoam (5.5%)

(2)    For costs of suit incurred herein, plus attorneys' fees under the labor code,

according to proof; and

(3)    For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated 5/26/15

LAW OFFICE OF CHRISTOPHER P.

WALKER, P.C.

By _____

Christopher P. Walker
Attorney for Plaintiff

-7-

**COMPLAINT FOR DISCLARATORY JUDGMENT AS TO  EACH MEMBERS OWNERSHIP OF
THE EQUITY IN THE DEBTORAND THE RIGHT TO A DISTRIBUTION OF THE NET
PROCEEDS FROM THE BANKRUPTCY ESTATE**

Exhibit 1

## Mediation Agreement & Settlement

01/04/2011

**Ronen Armony** ("Ronen") and **Gary Kanter** ("Gary") (together referred to as the "Parties"), after extensive discussion, conferencing and mediation by, amongst and between the Parties, the mediation conferences being held on December 08, 10 & 14, 2010 (exclusive of additional phone calls and emails during the following days) for a cumulative amount of time in excess of eighteen (18) hours, state as follows:

Ronen and Gary, Parties to the mediation, have reached a settlement agreement resolving any and all claims, grievances and disagreements as against and between each other relating to property and developments, both completed and being developed thereupon situate in Victorville, CA, the exact location and description of such is known and familiar to both Parties.

The property consists of several parcels of land portions of which are developed, partially developed and undeveloped.

In all cases of a split of ownership, the amount to be divided is the whole of the parcel or parcels and not just that amount or percentage that may be in the name of either individual or individual's LLC. "Owned" is taken to mean "owned or otherwise controlled."

For valuable consideration, the amount and value of such is known and acknowledged by and between the Parties, it is hereby agreed to as follows:

1. As to Pad **4** (APN# 3095-221-30 [approx. 50, 895 sq. ft.]), owned by Ronen, it's split 80/20 percent in Ronen's favor, with an option in the amount of one dollar ($1.00) for Ronan to take 100%,

2. As to Pad 6 (APN# 3095-221-31 [approx. 39,190 sq. ft.]), the same agreement as noted in Paragraph 1 above.

    a)    It is also agreed by Gary that all rents that are currently coming from Pads 4 and/or 6 will be confirmed and paid to Ronen as soon as reasonably possible, in spite of the fact that theses leases are within the possession of Ronen.

    b)    See also: Amendment No. 1 to Articles of Bear Valley Family Limited Partnership

3. Within one week from the date of this Agreement, Gary shall transfer a Wells Fargo account to Ronen.

ARMONY 0000523

1

4. Within thirty (30) days from the date of the signing of this Agreement, the Bank of the West Account, currently being utilized by the Bear Valley Family LP, shall be discontinued.

5. As to Pad 5 (APN# 3095- 221-30 [approx. 25,270 sq. ft.]), the Parties agree that it shall be owned 50/50 and transferred into an LLC with no minimum performance guarantees attached to the property. .

a) The LLC will be established by and between the two parties only, within 30 days if possible or as close thereafter as possible.

6. As to the building of a Hotel:

a)   Gary has represented that he has a franchise agreement to build a hotel upon certain identified properties  (APN#3095-221-38 [approx. 2.42 acres] & APN# 3095-221-37 [approx. 1.1 acres]) adjacent to the properties above noted and that he believes he can negotiate and transfer that right to build said Hotel on the "Remainder Land."

a.   Gary shall present the franchise agreement and any subsequent agreement transferring the right to build to the land as above-noted to Ronen at the earliest possible time.

b) The right to build a Hotel and the right to transfer its location to the Remainder Land will be put into an LLC to be formed by and between the parties again, if possible, within the next 30 days.

c) The LLC is to be owned by and between the parties and/or family, with no outside investors involved, on a 50%/50% basis. Ronen has the primary responsibility to facilitate funding for the Hotel and related improvements.

d) If the right to build the Hotel on the Remainder Land somehow is disallowed, then Ronen shall own the original allowed site land (50%/50%) delivered free and clear (as the Remainder Land), and still have the right to build the Hotel with Gary on the same terms (50%/50%) on the original allowed site with the Remainder Land being kept by Gary, with no amount of that Remainder Land property being given/shared by Ronen.

For definitional purposes, the Remainder Land (APN# 3095-221-39 [approx. 3.4 acres]) consists of sufficient land to build a hotel and a new *pad (of approx. 6,000 sq. ft.)*, intended eventually to have improvements built upon it, which will we will and have referred to as the "Remainder Land".

e) Any writing that Gary has indicating that he has the right to build the hotel (otherwise known as a franchise agreement) shall be produced to Ronen as soon as possible.

2


ARMONY 0000524

7. As to "Shakeys", it is agreed that it will be split 50/50 for the most part as per a prior agreement, except as otherwise noted herein, by and between the parties.

    a) A license agreement (or franchise agreement) is to be produced by Gary at the earliest possible time.

    b) Management of Shakeys will be as follows:  Final decision- making authority is to rest with Gary on day to day affairs and management, but on all major decisions, significant decisions, such decisions shall be with only after consultation of Ronan.

    c) Out of the first $300,000 profit and thereafter, two-thirds (2/3rds) shall be paid to Ronan, one-third (1/3rd) shall be paid to Gary until all capital contributions, inclusive of the loan that Ronen has contributed towards the Shakeys franchise, shall be repaid.  The loan shall continue to have a 4.5% interest rate. This specifically does not include the FF&E package that shall be paid for separately by the LLC.

    d) Ronen agrees that he will, as an astute businessman, use his best efforts to get an FF&E package at the best rate possible, subject to approval of Gary and Ronen together, and again, payment of that FF&E shall be through the LLC, separate and apart from two-thirds/one-third above noted. .

8. As part and parcel of this overall Settlement Agreement, we are also going to deal with a Banning/Rite Aid property.

    a) Ronen has agreed to sign an "over-the-top guarantee" in order to protect Gary on this project and will receive in return an additional 25% to be transferred at his (Ronen's) direction in the manner directed by Ronen to Gary.

    b) Gary has the right to negotiate a lockbox arrangement with the bank with regards to this property.

    c) As part of that negotiation, Gary and Ronen agree that, as necessary and applicable, Ronen will go to the bank with Gary in order to replace him and/or otherwise negotiate a deal so that Gary can step out of the deal and Ronen can take it over.

9. As to any and all amounts owed to Moorefield Construction, Inc., Ronen has agreed to negotiate and cover those costs. [No-Cap]

    a)    In the case of default in scheduled, uncured payments of the total $648,000.00 plus interest to Moorefield which results in any successful action, lien, hearing, and/or proceeding by Moorefield

3

ARMONY 0000525

as against Gary (personally and directly) relative to those
properties, Ronen agrees to transfer 18% of Pad 4 to Gary.

b)      However, Ronen will immediately negotiate with Moorefield to have
Gary removed as a possible direct target of any action, suit,
and/or proceeding by Moorefield based on any such default in
payments. If Gary is so personally protected, the above noted
paragraph 9 a) is void and/or moot.

10. As to any bank interest, Ronen has agreed to cover those costs (whatever
they may be after negotiation), and further as to that loan, both parties agree and
accept the loan, its terms and conditions as re-negotiated by Gary, the loan
identified as $800,000 down, and approximately $2.6 million loan for two years.
[No-Cap]

11. As to any taxes/penalties due and/or owing, Ronen agrees to pay those
amounts. [No Cap]

12. Seattle Best Coffee (aka Java Masters Victorville Valley): This shall be split,
51%/49% in Gary's favor due to the franchise agreement in place.

a) The property split will be effectuated with it being necessary that Gary
deliver the franchise's books with a "zero balance" (nothing owed and nothing
owing).

b)      Management of Seattle Best Coffee (Java Masters Victorville
Valley) will be as follows: Final decision- making authority is to
rest with Gary on day to day affairs and management, but on all
major decisions, significant decisions, such decisions shall be
with only after consultation of Ronan.

c) This paragraph (8) is dependent upon the resolution of the paragraph
dealing with lawyer's (Gary's) fees as noted below.

13. There was an unresolved issue as to how much Ronen is willing to cover of
the Lawyer (Gary's) costs.
This issue and the payment of the lawyer's costs has been resolved by payment
of $125,000.00 by Ronen to the lawyers with any "excess" being paid by Gary.

As such, in view of the resolution of those lawyers' fees, the Seattle Best Coffee
deal is agreed to as noted above and effective.

14. The parties have discussed extensively, both during this mediation and at
numerous times prior for months, various deals, amounts, costs, expenses
associated with all of the properties as aforementioned.



4

ARMONY 0000526

15. It is represented in good faith by Gary to the best of his knowledge to date [January 4, 2011] that he does not know of any other outstanding liens, encumbrances or other unpaid matters relating to the properties as discussed except as follows:

    a) Mechanics lien for "the channel" that may be placed on a portion of land formerly known as "Parcel 9."

    b) In such case (placement of such a lien), Gary will resolve and otherwise cause to be released the lien as it may effect in any way the Remainder Land at no cost to Ronen and or to the LLC.

16. Ronen represents in good faith that he will use his best efforts as aforesaid in all aspects of this deal, and both parties agree that, as prospective partners in the various and numerous LLC's as aforesaid, good faith, disclosure and harmony will reign at all times.

Thus, in good faith, Gary discloses that at a time prior to December 14, 2010, the Remainder Land, which we referred to earlier, was transferred to a different LLC. Gary represents that all necessary transfers as noted above will be made from whatever LLC in which the Remainder Land currently resides and/or is otherwise possessed and transferred into as per this Agreement/Settlement, to an LLC to be formed by the two parties.

17. The parties agree to cooperate with one another in the preparation and signing of any additional and/or other documents that are reasonably necessary and/or required to implement this settlement.

18. The Parties have thoroughly reviewed the entire agreement and understand its provisions.☐

19. The Parties have not waived any rights or claims that may arise after the date this agreement is signed.

20. ☐The Parties have the right to consult with their own attorney and/or counsel prior to signing this agreement. ☐

21. The Parties agree that this Agreement and listed documents on attached Schedule A (attached hereto and made a part hereof) constitutes the entire agreement and there are no other terms to the agreement except those specified herein. They further agree that this agreement may not be modified except by a writing executed by all of the parties to this agreement.

22. Should either Party believe that this agreement has been breached, the Parties agree to attempt to resolve the matter(s) through mediation before any litigation is instituted or initiated.



5

ARMONY 0000527

a) Best efforts will be used to utilize the mediation services of Marlon W. Schulman (323 304-3804) as he is already familiar with the background, issues and terms of the within Agreement.

23. Both Parties agree that this settlement agreement does not constitute an admission of guilt, fault, or liability on the part of either Party.

24. The terms of this agreement do not establish any precedent, nor may either Party or any representative organization to seek or justify similar terms in any civil action or subsequent litigation use the agreement as a basis.

25. The Parties shall keep the terms of this settlement confidential except as necessary to enforce its terms under the California Evidentiary Code.

26. No Party shall disclose the terms of the settlement or the facts, allegations, or other details of the litigation to any other parties, except those who have a legitimate need to know and then only to the extent of such need.

Accepted and Agreed to this January 4, 2011:

Ronen Armony

ARMONY 0000528

## **SCHEDULE A**

**Attached please find photocopied "First Pages" of related Agreements that are to be considered, in their whole "Master Form" as part of this Settlement Agreement**

- There are six (6) agreements in total

(5)

ARMONY 0000529

## AMENDMENT NO. 1 TO ARTICLES OF

## BEAR VALLEY FAMILY LIMITED PARTNERSHIP,

## A CALIFORNIA LIMITED PARTNERSHIP

The Articles and Partnership Agreement ("Articles") of BEAR VALLEY
FAMILY LIMITED PARTNERSHIP, a California Limited Partnership (the
"Partnership"), dated as of December 14, 2007, are hereby amended by its General
Partner, VV Bear Valley, LLC ("VV"), its undersigned initial four limited partners
("Initial LPs") and by its new additional Limited Partner, Ronen Armony and/or any
Permitted Transferee, as defined below ("Armony"), as of December 31, 2010, as
follows:

1.    **Representations and Warranties**

VV and the Initial LPs represent and warrant and agree to indemnify and defend
Armony and hold Armony harmless against any breach of the following representations
and warranties:

a.    There have been no prior amendments to the Articles which prevent and/or impede the signing & validity of this Amendment.

b.    VV and the Initial LPs are the only partners of the Partnership.

c.    Each of the Initial LPs presently owns and has a 24.5% interest in
the Partnership and VV owns and has a 2% interest in the Partnership.


ARMONY 0000530

## EXHIBIT B

## NAMES, ADDRESSES, CAPITAL ACCOUNT BALANCES AND PERCENTAGE INTERESTS OF THE MEMBERS

| Names | Capital Account and Unrecovered Capital Account Balance | Percentage Member(s) |
|---|---|---|
| Ronen Armony | | 49% |
| GSK Restaurant Management II, LLC | | 5% |
| KCT Irrevocable Trust, dated June 7, 2001 | | 46% |
| TOTAL VALUE OF INITIAL CAPITALIZATION: | $ | 100% |

EXHIBIT B

-1-

ARMONY 0000531

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

# PAD 5-VICTORVILLE, LLC

This Limited Liability Company Operating Agreement is entered into as of January _____, 2011 by 6767 Sunset Plaza, LLC, ASK Irrevocable Trust, dated June 7, 2001, and ASK Management Services, LLC (referred to individually as a Member and collectively as the Members or Managing Members).

    A.    The Members desire to form a limited liability company (Company) under the Beverly-Killea Limited Liability Company Act.

    B.    The Members enter into this Operating Agreement in order to form and provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

NOW THEREFORE, the Members hereby agree as follows:

## ARTICLE I:  DEFINITIONS

The following capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in California Corporations Code section 17001.

    1.1.    Intentionally Deleted.

    1.2.    "Act" means the Beverly-Killea Limited Liability Company Act (California Corporations Code sections 17000-17705), including amendments from time to time.

    1.3.    "Affiliate" means any person or entity which, directly or indirectly, through one (1) or more intermediaries, controls or is controlled by or is under common control with another person or entity. The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to (i) vote fifty-one percent (51%) or more of the outstanding voting securities of such person or entity, or (ii) otherwise direct management policies of such person by contract or otherwise.

    1.4.    "Agreement" means this Limited Liability Company Operating Agreement, as originally executed and as amended from time to time.

    1.5.    "Approval of the Members" means approval of the Managing Members.

    1.6.    "Articles of Organization" is defined in California Corporations Code section 17001(b), as applied to this Company.

1

ARMONY 0000532

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

## RHZA HIGH DESERT, LLC

This Limited Liability Company Operating Agreement is entered into as of December _____, 2010 by 6767 SUNSET PLAZA, LLC, a California limited liability company, KCT Irrevocable Trust, dated June 7, 2001, and GSK Restaurant Management, LLC (referred to individually as a Member and collectively as the Members).

A.      The Members desire to form a limited liability company (Company) under the Beverly-Killea Limited Liability Company Act.

B.      The Members enter into this Operating Agreement in order to form and provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

NOW THEREFORE, the Members hereby agree as follows:

### ARTICLE I: DEFINITIONS

The following capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in California Corporations Code section 17001.

1.1.    Intentionally Deleted.

1.2.    "Act" means the Beverly-Killea Limited Liability Company Act (California Corporations Code sections 17000-17705), including amendments from time to time.

1.3.    "Affiliate" means any person or entity which, directly or indirectly, through one (1) or more intermediaries, controls or is controlled by or is under common control with another person or entity.  The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to (i) vote fifty-one percent (51%) or more of the outstanding voting securities of such person or entity, or (ii) otherwise direct management policies of such person by contract or otherwise.

1.4.    "Agreement" means this Limited Liability Company Operating Agreement, as originally executed and as amended from time to time.

1.5.    "Approval of the Members" means approval of the Managing Members.

1.6.    "Articles of Organization" is defined in California Corporations Code section 17001(b), as applied to this Company.

1

ARMONY 0000533

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT FOR

## SHAKE IT UP-VICTORVILLE, LLC

This Limited Liability Company Operating Agreement is entered into as of January _____, 2011 by Ronen Armony, KCT Irrevocable Trust, dated June 7, 2001, and GSK Restaurant Management, LLC (referred to individually as a Member and collectively as the Members).

A.     The Members desire to form a limited liability company (Company) under the Beverly-Killea Limited Liability Company Act.

B.     The Members enter into this Operating Agreement in order to form and provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

NOW THEREFORE, the Members hereby agree as follows:

### ARTICLE I:  DEFINITIONS

The following capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in California Corporations Code section 17001.

1.1.    Intentionally Deleted.

1.2.    "Act" means the Beverly-Killea Limited Liability Company Act (California Corporations Code sections 17000-17705), including amendments from time to time.

1.3.    "Affiliate" means any person or entity which, directly or indirectly, through one (1) or more intermediaries, controls or is controlled by or is under common control with another person or entity.  The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to (i) vote fifty-one percent (51%) or more of the outstanding voting securities of such person or entity, or (ii) otherwise direct management policies of such person by contract or otherwise.

1.4.    "Agreement" means this Limited Liability Company Operating Agreement, as originally executed and as amended from time to time.

1.5.    "Approval of the Members" means approval of the Managing Members.

1.6.    "Articles of Organization" is defined in California Corporations Code section 17001(b), as applied to this Company.

1

ARMONY 0000534

### AMENDMENT NO. 1 TO ARTICLES OF
### BEAR VALLEY FAMILY LIMITED PARTNERSHIP,
### A CALIFORNIA LIMITED PARTNERSHIP

The Articles and Partnership Agreement ("Articles") of BEAR VALLEY FAMILY LIMITED PARTNERSHIP, a California Limited Partnership (the "Partnership"), dated as of December 14, 2007, are hereby amended by its General Partner, VV Bear Valley, LLC ("VV"), its undersigned initial four limited partners ("Initial LPs") and by its new additional Limited Partner, Ronen Armony and/or any Permitted Transferee, as defined below ("Armony"), as of December 31, 2010, as follows:

1. **Representations and Warranties**

VV and the Initial LPs represent and warrant and agree to indemnify and defend Armony and hold Armony harmless against any breach of the following representations and warranties:

a.  There have been no prior amendments to the Articles which prevent and/or impede the signing & validity of this Amendment.

b.  VV and the Initial LPs are the only partners of the Partnership.

c.  Each of the Initial LPs presently owns and has a 24.5% interest in the Partnership and VV owns and has a 2% interest in the Partnership.

Page 1 of 4

ARMONY 0000535



d.   This Agreement is entered into for good and valuable consideration, receipt of which is hereby acknowledged.

VV further represents and warrants and agrees to indemnify Armony and hold Armony harmless against any breach of the following representations and warranties:

e.   To the best of VV's knowledge, there are no claims against or liabilities of the Partnership, whether contingent, potential or otherwise, except to Bank Midwest, Moorefield Construction, Inc., for property taxes, and as set forth in a Schedule 1 heretofore delivered to Armony and approved by him in writing.

f.   Each individual signing this Agreement as or for VV or an Initial LP has the full authority and is duly authorized and empowered to execute this Agreement on behalf of the party for which he signs.

## 2.   Transfer of Partnership Interests

The Initial LPs hereby each transfer a 20% interest in the Partnership to Armony, whose percentage interest is now 80%. Each of the Initial LPs hereby further agree to transfer to Armony upon 30 day noticed demand their remaining 4.5% interests, for the sum of $1.00, and VV also agrees to transfer its 2% interest in the Partnership for the sum of $1.00.

Page 2 of 4

ARMONY 0000536

3.    **Permitted Transfer**

Armony may transfer any or all of his Partnership Interest to a limited liability company or trust or other entity or form of ownership at least 51% of which is owned or controlled by him.

4.    **General Provisions**

Each party hereto shall execute, acknowledge and deliver to the other all documents, agreements, contracts, or other instruments which may hereafter be necessary to enable them to carry out the terms hereof or any executory provision of this Amendment to the Partnership Agreement. All such documents, including this Amendment may be executed in counterparts and delivered by facsimile transmission or transmission as a pdf to electronic mail.

**GENERAL PARTNER** *on behalf of Limited Partners.*

Dated: _Jun 4, 11_

**VV BEAR VALLEY, LLC**

by: _____
    Gary Kanter

**LIMITED PARTNERS** — *If signatures necessary, General Partner will obtain same from Limited Partners.*

Dated: _N/A_

[name:]_____
By:_____
his/her/its_____

Page 3 of 4

ARMONY-0000537

Dated: _____          [name:]_____
                            By: _____
                            his/her/its _____

Dated: _____          [name:]_____
                            By: _____
                            his/her/its _____

Dated: _____          [name:]_____
                            By: _____
                            his/her/its _____

## NEW LIMITED PARTNER

Armony hereby agrees to and accepts this Amendment and the Partnership

Agreement and agrees to be bound thereby.

Dated: _Jun -4- 2010_          _____
                                        Ronen Armony

Page 4 of 4

ARMONY 0000538